IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| JESSICA ROSEBERRY | : | CIVIL ACTION |
|  | : |  |
| v. | : |  |
|  | : |  |
| CITY OF PHILADELPHIA, et al. | : | NO. 14-2814 |
|  | : |  |

## MEMORANDUM

**Padova, J.**                                                                                          **March 3, 2016**

Currently pending before the Court is the Motion for Summary Judgment by Defendants the City of Philadelphia (the "City"), Lieutenant James Smith, Sergeant Colleen Cook, Sergeant. Ron Washington, Sergeant. Tyrell McCoy, Sergeant. Aaron Green, Corporal. Tanya Henry-Jackson, Lieutenant. Tanya Covington, Lieutenant. Joseph McBride, Corporal Shannon Brambrinck, Sergeant Curtis Miller, and Captain David Bellamy (collectively, "Defendants"). For the following reasons, the Motion is granted in its entirety and judgment is entered in favor of all Defendants and against Plaintiff.

## I.      BACKGROUND[1]

A.      <u>Plaintiff's Employment in the 18th District of the Philadelphia Police Department</u>

On December 2, 1996, Plaintiff Jessica Roseberry was hired by the City of Philadelphia as a Police Officer Recruit.  (Defs.' Mot. Summ. J., Ex. 9.)  She was promoted to Police Officer, on May 20, 1997, and assigned to the 18th District.  (Id.; Defs.' Mot. Summ. J., Ex. 8, Dep. of Jessica Roseberry ("Roseberry Dep."), 11:21–12:3, June 4, 2015.)  For the first two years of her career in the 18th District, Plaintiff was placed on squad 1B, where she worked a rotating shift as

---

[1] As Plaintiff provides only a cursory factual recitation with little citation to actual evidence, the Court generally follows Defendants' organization of facts in their Motion. Nonetheless, the Court has thoroughly reviewed both parties' submissions and the evidence of record.

a patrol officer, and then as a tactical officer who responded to priority jobs. (Id. at 12:17–13:8.) Subsequently, she was asked to be a member of the Narcotics Enforcement Team. (Id. at 12:17–22, 13:15–14:21.) As a member of that team, her duties included identifying narcotic sales and testifying as an expert narcotics officer. (Id. at 14:1–14.) On occasion during her time with the Narcotics Enforcement Team, Plaintiff would be placed in the Gun Task Force to investigate homicides and aggravated assaults involving a weapon. (Id. at 14:24–15:21.) From 2003 to 2010, Plaintiff was assigned to 5-squad tactical uniform, where she would cover areas prone to homicides, aggravated assaults, robberies, burglaries, and weapons offenses. (Id. at 16:3–16:20.)

  B. <u>Defendants' Work History Within the 18th District</u>

  Defendant Lt. Joseph McBride worked as a Police Officer in the 18th District from 1995 to 2007. (Defs.' Mot. Summ. J., Ex. 13, Dep. of Lt. Joseph McBride ("McBride Dep."), 13:6–18, July 29, 2015.) He was promoted to sergeant on October 15, 2010. (Id. at 13:4–15.)

  Defendant Capt. David Bellamy served as the Commanding Officer of the 18th District from October 2010 to January 2014. (Defs.' Mot. Summ. J., Ex. 14, Dep. of Capt. David Bellamy ("Bellamy Dep."), 25:10–22, Sept. 17, 2015.) In that role, he supervised approximately two hundred officers, seventy crossing guards, and civilian staff, as well as a mini station called the University City District ("UCD") within the 18th District, which had approximately twenty-five officers, two sergeants, and a lieutenant. (Id. at 26:6–14.)

  In 2010, Defendants Sgts. Colleen Cook and Ron Washington worked in UCD as Plaintiff's supervisors. (Id. at 32:19–21.) Sgt. Cook supervised Plaintiff from 2009 to the beginning of 2011. (Defs.' Mot. Summ. J., Ex. 15, Dep. of Lt. Colleen Cook ("Cook Dep."), 35:19–36:9, 67:21–68:4, June 8, 2015.) Sgt. Washington began supervising Plaintiff in 2011. (Id. at 68:2–12.)

Defendant Cpl. Shannon Brambrinck worked in the 18th District from 2009 to 2013. (Defs.' Mot. Summ. J., Ex. 16, Dep. of Cpl. Sharon Conway, formerly Brambrinck ("Brambrinck Dep."), 10:2–12, Aug. 3, 2015.) Although she was Plaintiff's corporal, she never directly supervised Plaintiff. (Id. at 27:14–18, 28:11–17, 31:18–32:2.)

Defendant Lt. Tanya Covington worked in the 18th District from April 2009 to March 2013. (Defs.' Mot. Summ. J., Aff. of Lt. Tanya McCowen, formerly Covington ("Covington Aff."), ¶ 3.) She acted as Plaintiff's supervising lieutenant from October 2010 to February 2013. (Id. ¶ 4; Roseberry Dep. 28:12–27.)

Defendant Sgt. Aaron Green was assigned to the 18th District from October 2010 to November 2012. (Defs.' Mot. Summ. J., Ex. 17, Internal Affairs Division ("IAD") interview of Sgt. Aaron Green, pp. 1–2, Oct 2, 2014; Roseberry Dep. 24:11–21.) Defendant Cpl. Tanya Henry-Jackson worked in the 18th District from December 2011 to December 2012. (Defs.' Mot. Summ. J., Ex. 12, Aff. of Cpl. Tanya Henry-Jackson ("Henry-Jackson Aff.") ¶ 2.) Defendant Sgt. Curtis Miller worked in the 18th District's 2-squad and supervised Plaintiff from 2012 to 2014, but was not her direct sergeant. (Defs.' Mot. Summ. J., Ex. 18, Dep. of Sgt. Curtis Miller ("Miller Dep."), 29:10–31:3, Jul 30, 2015.) Finally, Defendant Sgt. Tyrell McCoy worked in the 18th District line squad beginning in 2013, when he became Plaintiff's supervisor. (Bellamy Dep. 32:19–22; Defs.' Mot. Summ. J., Ex. 10, Sgt. Tyrell McCoy ("McCoy Dep."), 9:1–7, July 24, 2015; Roseberry Dep. 19:13-20:12.) Defendant Lt. James Smith never worked in the 18th District. (Defs.' Mot. Summ. J., Ex. 19, Dep. of Lt. James Smith ("Smith Dep."), 36:10–38:8, June 11, 2015.)

C.    Plaintiff's Performance Evaluations

As an employee of the Police Department, Plaintiff received annual performance evaluations, which were written by her direct supervisor and reviewed by her second-level supervisor (the "reviewing officer").  (Roseberry Dep. 37:5–38:8.)  The evaluations would be presented to Plaintiff for her review, after which she had the opportunity to agree or disagree with them and to discuss the reports with a reviewing officer.  (Id. at 38:9–19.)

On March 27, 2010, Sgt. Cook provided Plaintiff with a performance evaluation that rated her as "satisfactory" in all relevant categories and included many positive comments about her job performance.  (Defs.' Mot. Summ. J., Ex. 20.)  On April 1, 2011, Sgt. Washington gave Plaintiff a performance evaluation that likewise rated her as "satisfactory" and also included many positive comments.  (Defs.' Mot. Summ. J., Ex. 21.)  The April 12, 2012 performance evaluation from Sgt. Green likewise marked Plaintiff "satisfactory" in all relevant categories, but Sgt. Green indicated that he was unable to give a true assessment of Plaintiff's performance due to her being out on long term leave.  (Defs.' Mot. Summ. J., Ex. 22.)

D.    Plaintiff's Report of Her Neighbor's Drug Activity

In March or April 2010, Plaintiff informed her supervisor, Sgt. Paul Brown, of possible drug activity occurring near her home.  (Roseberry Dep. 47:16–48:10, 49:16–50:3.)  Around the same time, she notified both Nathaniel London in the Narcotics Field Unit and Melvin Floyd in the Narcotics Strike Force that "the guys next door were selling narcotics from the home."  (Id. at 48:11–18, 49:5–9.)  Although she provided multiple pieces of information regarding suspicious activity, the Police Department took no resulting actions.  (Id. at 50:15–52:6.)

E.    The Search of Plaintiff's Residence

On September 29, 2010, Plaintiff was at home watching television with her daughter and their dog in her bedroom, when she heard rustling in the hallway.  (Id. at 52:7–23.)  She grabbed her off-duty weapon, opened the door to the bedroom, and saw five individuals standing at the door with their guns pointed at her.  (Id. at 53:3–7.)  One individual asked her to put her weapon down, and she noticed that another individual had a law enforcement emblem on his hat.  (Id. at 53:8–15.)  She identified herself and her sergeant, and one of the individuals identified himself as Lieutenant Smith.  (Id. at 53:16–17.)  She asked what was going on and requested that they talk downstairs so her daughter would not hear.  (Id. at 53:18–21.)  She also tried to shut the bedroom door in order to get dressed, but Lt. Smith kept his foot in door.  (Id. at 53:22–54:2.)

Plaintiff and Lt. Smith went downstairs and Lt. Smith told her that his team arrested someone who tried to come into her home.  (Id. at 54:3–10.)  When Plaintiff questioned his story, Lt. Smith indicated that no one had actually come in to the house, but he was just trying to make her see how easy it was for someone to enter.  (Id. at 54:11–18.)  Shortly thereafter, he had an officer bring an arrestee to her door for her to identify him as the "the guy that [she] made the complaint against."  (Id. at 55:9–22.)  Plaintiff demanded to know why he would bring the arrestee to her front door, but he simply smirked and walked away.  (Id. at 56:4–6.)  He also said to her, "listen here, little girl, I've been doing this for a long time."  (Id. at 58:18–23.)  She indicated that she refused to identify the drug dealer at her front door because that would have put her and her daughter in danger.  (Id. at 66:3–67:8.)  By this time, her ex-partner and lieutenant had come to the house and told her to make an official complaint to Internal Affairs.  (Id. at 56:9–16.)

F.    Plaintiff's Complaints to Supervisors About the Search

On September 30, 2010, Plaintiff met with her supervisors, Lt. Cook and Capt. Lynch, about the previous day's events. (Id. at 68:2–9.) She described the whole incident and remarked that Lt. Smith broke into her home, made her identify a drug dealer, and was very disrespectful to her. (Id. at 69:1–20.) Capt. Lynch responded that he had spoken to Lt. Smith's commanding officer, who he told him that Plaintiff's home was deplorable, with animal feces and trash thrown about. (Id. at 71:9–15.) Lynch then said that he was going to handle it "in-house." (Id. at 72:5–9.)

Capt. Lynch told Plaintiff to take two weeks off because she was emotional. (Id. at 73:20–23.) She ultimately used three weeks of sick time as a result. (Id. at 74:3–15.) In addition, a police vehicle was placed outside of her home for her safety. (Id. at 72:24:73:1, 81:4–83:10.) She was not disciplined and did not receive a counseling memo for her time off. (Id. at 75:1–12.)

A few months later, Plaintiff used additional sick time. (Id. at 75:13–16, 76:15–19.) Although she was not disciplined and did not receive a counseling memo, she alleged that she was harassed by Captain Bellamy, who made statements asking supervisors if she was crazy and threatening to discipline her for missing over thirty court dates. (Id. at 75:17–76:9, 77:3–116.) Plaintiff believed she was mentally incapacitated during that time because one of the officers that broke into her home threatened her when she was at court for making a complaint to Internal Affairs.[2] (Id. at 78:20–79:5.)

In October 2010, Plaintiff submitted a complaint to the Philadelphia Police Department Internal Affairs Unit about the search at her home. (Id. at 84:9–22.) According to Plaintiff, she

---

[2] Specifically, when that officer saw her in court, he shook his head and said that she should have never made that complaint. (Id. at 79:8–12.)

did so in part because Sgt. Cook told her she's "got to do what [she's] got to do because eventually they're going to try to flip this on [her]." (Id. at 85:13–21.) Plaintiff submitted a typewritten complaint dated September 30, 2010. (Defs.' Mot. Summ. J., Ex. 23.) She remarked that she wondered how many other people this had been done to and how long "they" had been doing it. (Roseberry Dep. 86:16–19.) Other than a gut feeling, however, she had no evidence that this had ever happened to anyone else. (Id. at 86:20–87:3.) Although she had an interview with Internal Affairs, nothing else happened as a result of her complaint. (Id. at 87:24–88:5.)

During the first or second week of October, Plaintiff told Sgt. Cook about her complaint to Internal Affairs, but Cook said she did not want to get involved. (Id. at 88:15–90:11.) Plaintiff also told Capt. Bellamy, and he agreed that she took the right action. (Id. at 89:6–90:21.) In addition, Plaintiff mentioned the complaint to an Officer Raul Gray, her former partner Ronald Green, and Sgt. Aaron Green. (Id. at 91:5–19.)

G.     Plaintiff's Later Complaints About Lt. Smith's Actions

On December 25, 2011, Plaintiff gave a typewritten memo to Capt. Bellamy complaining about Lt. Smith's attempt to "get dirt" on Plaintiff from Sgt. Cook. (Defs.' Mot. Summ. J., Ex. 24; Roseberry Dep. 235:18–238:12.) In response, Capt. Bellamy asked her to prepare a memo asking to be removed from Sgt. Cook's squad. (Roseberry Dep. 238:13–18.) Plaintiff prepared the memo and her transfer request was approved. (Id. at 238:19–239:1.)

On January 3, 2012, Plaintiff complained to Internal Affairs about Lt. Smith's attempt to get information about Plaintiff's hygiene from Sgt. Cook in preparation for Smith's disciplinary hearing. (Defs.' Mot. Summ. J., E. 2; Roseberry Dep. 94:13–22.) Thereafter, on January 17, 2012, Plaintiff was interviewed by Internal Affairs investigator Lt. Joseph Staab. (Id. at 242:1–

15, Defs' Mot. Summ. J., Ex. 26.) Plaintiff indicated that she believed that Sgt. Cook's giving of information hours before a hearing was a violation. (Defs.' Mot. Summ. J., Ex. 26.)

Lt. Staab interviewed Sgt. Cook on February 2, 2012, (Defs.' Mot. Summ. J., Ex. 27), and, on February 6, 2012, Plaintiff was interviewed by Internal Affairs investigator Lt. Danielle Vales. (Roseberry Dep. 246:18–247:13.; Defs.' Mot. Summ. J., Ex. 28.) At that time, Plaintiff stated that "[t]here is no direct knowledge of corruption but there ha[ve] been several incidents of harassment since before my interview with you on 1-17-12." (Defs.' Mot. Summ. J., Ex. 28, p. 1.) Plaintiff referenced Sgt. Cook's statement that Cook put Plaintiff in the same category as two other officers who had been arrested for drug dealing. (Id. at 2.) Plaintiff also stated that Sgt. Cook interfered with her efforts to transfer out of Cook's squad because she feared that the transfer would make her (Cook) look bad, and that Cook said to another officer, "Yeah that b**ch ain't going nowhere." (Id. at 2–3.) In addition, Plaintiff indicated that Sgt. Washington started saying things about her, would give her assignments at times when she had to leave to get her daughter, and called her a troublemaker to other supervisors. (Id. at 3–5.) Plaintiff also reportedly had issues with Capt. Bellamy, who allegedly sick-checked her on January 21, 2012, and with Lt. Covington, who interfered with her application for a sunshine pass while she was out sick. (Id. at 7–8.)

Plaintiff told Capt. Bellamy about this Internal Affairs complaint and indicated that IAD never interviewed Sgt Cook. (Bellamy Dep. 55:4–9.) As a result, Bellamy personally called Internal Affairs and told them to reopen the case and re-interview the relevant participants. (Id. at 55:10–18.)

H.     Plaintiff's First Civil Rights Lawsuit

On July 13, 2012, Plaintiff filed a lawsuit against Defendants Lt. Smith and the City, among others,[3] alleging multiple federal civil rights violations, including a claim of retaliation for her reports of corruption.  (Defs.' Mot. Summ. J., Ex. 29.)  She also averred that the City tolerated, ratified, and was deliberately indifferent to these violations, and that the City failed to properly sanction or discipline officers for their actions.  (Id.)  On September 21, 2012, the Honorable R. Barclay Surrick dismissed the case with prejudice pursuant to Rule 41.1(b) of the Local Rules of Civil Procedure of the Eastern District of Pennsylvania.[4]

I.     Plaintiff's Next Internal Complaint

On October 26, 2012, Plaintiff submitted another typewritten complaint to Capt. Bellamy.  (Defs.' Mot. Summ. J., Ex. 31; Roseberry Dep. 267:9–268:16.)  The complaint described an incident wherein Plaintiff was attempting to interview a hostile and belligerent complainant who refused to provide the pertinent information necessary for Plaintiff to complete the required form.  (Defs.' Mot. Summ. J., Ex. 31.)  Despite Plaintiff's explanation of her difficulty in completing the report, Sgt. Green remarked that the report was too vague, and then humiliated her in front of her coworkers by calling her incompetent.  (Id.)  On March 10, 2014, Plaintiff complained to Internal Affairs about harassment by Sgt. Brambrinck, Cpl. Henry-

---

[3] The other defendants included P.O. Brant Miles, P.O. Andrew Schaefer, P.O. Taven Washington, P.O. Kevin Devine, and P.O. Kenneth Long.

[4] "Whenever in any civil action counsel shall notify the Clerk or the judge to whom the action is assigned that the issues between the parties have been settled, the Clerk shall, upon order of the judge to whom the case is assigned, enter an order dismissing the action with prejudice, without costs, pursuant to the agreement of counsel."  E.D. Pa. Local Rule Civ. P. 41.1(b).

Jackson, Sgt. Green, Lt. Covington, Sgt. Miller, Lt. McBride, Capt. Bellamy, Lt. Riley, and Sgt. McCoy. (Roseberry Dep. 95:5–96:2; Defs.' Mot. Summ. J., Exs. 32, 33.)

Plaintiff also went to the Police Department's Employee Assistance Program ("EAP") regarding the search of her home and the alleged harassment. (Roseberry Dep. 101:22–102:2, 102:22–103:10.) The EAP provides confidential peer counseling and support services to assist Police Department personnel. (Defs.' Mot. Summ. J., Ex. 34.) EAP records are kept confidential, with certain limited exceptions. (Id.) An employee may self-refer or may be referred by the employee's supervisor. In this case, Capt. Lynch sent Plaintiff to EAP in the presence of Sgt. Cook, Sgt. Marsden, Lt. McBride, Capt. Bellamy, and Lt. Covington. (Id. at 110:16–111:19.)

J.        The Alleged Retaliation Against Plaintiff

Plaintiff asserts that as a result of her bringing charges for alleged corruption in the Nartcotics Unit, she "became a pariah" within the Police Department. (Id. at 112:11–17.) People allegedly started labeling her as a drug dealer or a drug dealer's girlfriend. (Id. at 112:21–22.) Officers made lewd remarks in the courthouse that the reason the Commissioner found Lt. Smith guilty was because Plaintiff had slept with the Commissioner. (Id. at 112:22–113:3.) Two other individuals in the courthouse talked about how sexy she must have looked standing there "in her underclothes holding a 357." (Id. at 113:5–8.)

In addition, Plaintiff alleges that after her 2012 lawsuit, Defendants subjected her to multiple adverse employment actions. These actions are discussed in more detail below.

K.        Procedural History

Plaintiff commenced an action against Defendants on December 20, 2013 in the Philadelphia County Court of Common Pleas by filing a Praecipe to Issue Writ of Summons

against the Defendants. (Defs.' Mot. Summ. J., Ex. 1.) On April 1, 2014, Defendants filed a Praecipe and Rule to File a Complaint asking the Court to order that Plaintiff file her Complaint within twenty days. (Defs.' Mot. Summ. J., Ex. 2.) Plaintiff filed her Complaint on May 12, 2014, alleging (1) discrimination under both Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-1, et seq., and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §§ 951–963; (2) interference with Plaintiff's rights under the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601, et seq.; and (3) intentional and/or negligent infliction of emotional distress. (Defs.' Mot. Summ. J., Ex. 3.) The matter was removed to federal court on May 15, 2015. Plaintiff then filed a First Amended Complaint on July 3, 2014, and a Second Amended Complaint on November 17, 2014. (Defs.' Mot. Summ. J., Ex. 4.) The Second Amended Complaint contains only two counts for relief: (1) an allegation against all Defendants for First Amendment violations and a corresponding Monell claim against the City; and (2) an allegation of a conspiracy to violate her civil rights.

On October 15, 2015, Defendants filed the present Motion for Summary Judgment. Plaintiff responded on November 23, 2015 and requested the withdrawal of: (1) her Monell claim; (2) her conspiracy claim under 42 U.S.C. § 1985; and (3) her claims against Defendants Washington, Cook, McBride, and Smith. These concessions leave only her claims of First Amendment retaliation against Defendants McCoy, Green, Henry-Jackson, Covington, Brambrinck, Miller, and Bellamy. Defendants filed a Reply Brief on December 4, 2015, making the Motion ripe for judicial consideration.

## II.    LEGAL STANDARD

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)). Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987). If a conflict arises between the evidence presented by the parties, the court must accept as true the allegations of the non-moving party. Anderson, 477 U.S. at 255.

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Moreover, the mere existence of

some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue.  <u>Anderson</u>, 477 U.S. at 249–50.

## III.    DISCUSSION

Defendants presently seek summary judgment on the entirety of the Second Amended Complaint.  In support of their Motion, they set forth six arguments as follows: (1) Plaintiff's claims against Sgt. Cook and Sgt. Washington, along with some claims against Capt. Bellamy, are barred by the statute of limitations; (2) Plaintiff's claims against the City, Lt. Smith, Sgt. Cook, Sgt. Green, Lt. Covington, Sgt. Washington, and Capt. Bellamy are barred by the doctrine of claim preclusion; (3) Plaintiff's Section 1983 First Amendment retaliation claims fail against the individual Defendants because she cannot prove that her report of police corruption to Internal Affairs in 2010 was a substantial factor in causing retaliatory conduct that was sufficient to deter a person of ordinary firmness from exercising her rights; (4) Plaintiff's Section 1983 claim against the City fails because she cannot identify a City policy, practice, procedure, or custom that exhibits deliberate indifference to Plaintiff's civil rights; (5) the individual Defendants are entitled to qualified immunity regarding Plaintiff's Section 1983 First Amendment retaliation claims; and (6) Plaintiff's Section 1985(3) conspiracy claims against all Defendants fail because they are barred by Pennsylvania's intracorporate conspiracy doctrine and because Plaintiff cannot establish that Defendants agreed to engage in a concerted effort to violate Plaintiff's civil rights.  The Court addresses each argument individually.[5]

---

[5] Given Plaintiff's request to withdraw all of her claims against the City, as well as her conspiracy claims against all Defendants, the Court need not discuss either Defendants' fourth argument or Defendants' sixth argument.  With respect to the remaining arguments, the Court considers them only to the extent that they involve Defendants McCoy, Green, Henry-Jackson,

A.    Statute of Limitations

Defendants first assert that any allegations against Defendant Capt. Bellamy involving conduct that occurred before May 12, 2014 are barred by the statute of limitations.  As 42 U.S.C. § 1983 does not contain a statute of limitations, courts look to 42 U.S.C. § 1988, which requires use of the statute of limitations for the state where the federal court sits, unless its application would conflict with the Constitution or with federal law.  Lake v. Arnold, 232 F.3d 360, 368 (3d Cir. 2000).  In Pennsylvania, the statute of limitations applicable to section 1983 suits is the two-year limitations period set forth in 42 Pa. C.S. § 5524(2) for personal injury actions.  See Montgomery v. DeSimone, 159 F.3d 120, 126 n.4 (3d Cir. 1998) (noting that courts should apply state statute of limitations applicable to personal injury torts).  "It is axiomatic that under federal law, which governs the accrual of section 1983 claims, 'the limitations period begins to run from the time when the plaintiff knows or has reason to know of the injury which is the basis of the section 1983 action.'"  Id. (quoting Genty v. Resolution Trust Corp., 937 F.2d 899, 919 (3d Cir. 1991)).

Under the Pennsylvania Rules of Civil Procedure, "[a]n action may be commenced by filing with the prothonotary (1) a praecipe for a writ of summons, or (2) a complaint."  Pa. R. Civ. P. 1007.  Thus, in Pennsylvania, the filing of a praecipe for a writ of summons is sufficient to commence a civil action and toll the statute of limitations.  See Vail v. Harleysville Grp., Inc., No. Civ.A.02-2933, 2002 WL 32172799, at *2 (E.D. Pa. Sept. 30, 2003).  This state rule applies equally to cases removed to federal court.  See id. ("[C]ompliance with the Pennsylvania procedural rule satisfies the tolling requirement in cases removed to [the Eastern District of Pennsylvania].") (quoting Perry v. City of Phila., No. Civ.A.99-2989, 1999 WL 672640, at *1

Covington, Brambrinck, Miller, and/or Bellamy, as Plaintiff has also withdrawn her claims against Defendants Washington, Cook, McBride, and Smith.

(E.D. Pa. Aug. 17, 1999)). In other words, when a plaintiff files a writ of summons in Pennsylvania state court, and that action is subsequently removed to federal court, the action is not time barred if the writ was filed within the statute of limitations period. Heater v. Kidspeace, No. Civ.A.05-4545, 2005 WL 2456008, at *2 (E.D. Pa. Oct. 5, 2005).

In the present case, Plaintiff asserts that she was subject to certain discrete retaliatory acts by Capt. Bellamy. Among them is the allegation that, around Thanksgiving 2010, Captain Bellamy transferred Plaintiff out of 5-squad and put her into line squad after she complained that supervisors were harassing her in reference to her report about corruption. (Roseberry Dep. 141:9–142:20, 256:8–12.) In addition, Plaintiff claims that Capt. Bellamy sick-checked her on January 21, 2012. (Id. at 258:3–9.) Pursuant to the discovery rule, the statute of limitations for such claims began running on the date Plaintiff became aware of these actions—November 2010 and January 21, 2012 respectively. Plaintiff initiated this action in Pennsylvania state court on December 20, 2013, by filing a Praecipe to Issue Writ of Summons. As this date occurred more than two years after the November 2010 transfer of Plaintiff out of 5-squad, any claim relating to that event is unequivocally time-barred.

The timeliness of the latter event, however—the January 21, 2012 sick-check—poses a more difficult question. The Writ of Summons was filed within two years of the event in question and, as noted above, was sufficient to toll the statute of limitations. Thereafter, on May 12, 2014, Plaintiff filed her Complaint, alleging discrimination claims under Title VII and PHRA, an interference claim under the FMLA, and state law claims against Defendants, including Defendant Bellamy, with no mention of any First Amendment retaliation claims. Plaintiff initially raised her First Amendment retaliation and conspiracy claims in the First Amended Complaint on July 3, 2014, well after the two-year statute of limitations had expired.

Defendants now contend that, under Federal Rule of Civil Procedure 15(c)(1), such claims do not relate back to the Writ of Summons and, therefore, must be deemed untimely.

The Court must disagree.  As noted above, under Pennsylvania law, the act of filing the Praecipe served to commence Plaintiff's action in state court and to effectively toll the statute of limitations.  <u>See</u> Pa. R. Civ. P. 1007; <u>Galbraith v. Gahagen</u>, 204 A.2d 251, 252 (Pa. 1964). Following removal to federal court, the Praecipe filing date remained controlling for purposes of the statute of limitations.  <u>See</u> <u>Bennett v. Consol. Rail Corp.</u>, No. Civ.A.88-3337, 1988 WL 94280, at *3 (E.D. Pa. Sept. 8, 1988) (filing of writ controls, even if it is later determined that United States District Court had exclusive original jurisdiction over claim).  In the analogous case of <u>Lempa v. Rohm & Hass Co.</u>, No. Civ.A.05-985, 2007 WL 878496 (E.D. Pa. Mar. 20, 2007), the plaintiff claimed that he was constructively discharged in March 2003, and subsequently commenced the action by filing a praecipe for writ of summons in the Court of Common Pleas of Philadelphia County, Pennsylvania on February 2, 2005.  <u>Id.</u> at *1.  On May 25, 2005, the plaintiff filed his initial complaint.  <u>Id.</u> at *4.  After the district court found that the plaintiff's contract claims were preempted, the plaintiff sought leave to amend his complaint and the defendant opposed the amendment because the complaint was not filed until over two years after the alleged constructive discharge, rendering the claim time-barred.  <u>Id.</u>  The defendant argued that Rule 15(c) would not allow the amendment to relate back to the praceipe for writ of summons because a praceipe did not constitute a pleading and the complaint was filed after the limitations period expired.  <u>Id.</u>  The district court disagreed and found that this "procedural anomaly" did not bar the plaintiff's request to amend his complaint, noting that "[f]ollowing

removal to federal court, the praecipe filing date is controlling for purposes of the statute of limitations."[6] Id. at *5.

The court in Giehl v. Terex Utils., No. Civ.A.12-083, 2013 WL 618775 (M.D. Pa. Feb. 19, 2013) reached a similar result. In that matter, the plaintiffs initiated a cause of action by filing a praecipe for writ of summons in the Court of Common Pleas of Wayne County, Pennsylvania on June 29, 2011. Id. at *1. The plaintiffs then filed their complaint on or about December 16, 2011 seeking to recover damages for injuries, and the defendants removed the action to federal court on January 12, 2012. Id. Following Rule 26 disclosures, the plaintiffs sought to amend the complaint to correct misnamed defendants and the defendants opposed the amendment on grounds of timeliness. Id. The court noted that although a writ of summons is not recognized as a pleading under Pennsylvania or federal procedural law, that fact does not clearly bar a request to amend the complaint. Id. at *3. "Thus, if the amendments relate back in time, they relate back to the date of the writ of summons because that was the original filing permitted under Pennsylvania law." Id. at *3. In that case, the writ of summons was timely filed within the applicable two-year statute of limitations period and the defendants did not dispute that the proposed amendments satisfy the requirements of Rule 15(c)(1)(C). Id. Finding that

---

[6] Defendants go to great lengths to distinguish Lempa, arguing that the plaintiff in that case gave some indication, when filing the writ of summons, that the claim was categorized as "contract," that it involved an amount in controversy over $50,000, and that it involved the Age Discrimination in Employment Act and the PHRA as statutory bases. Those purported factual distinctions, however, do not detract from the key holding that when a case is initiated by writ of summons in state court and followed by a complaint, an amendment to that complaint made after removal to federal court relates back to the filing of the writ of summons, and not to the original version of the complaint. In any event, Defendants in this case, like those in Lempa, were put on fair notice, as of the filing of Plaintiff's initial complaint, that the case involved some type of discrimination claim based on various allegations of harassment by the various Defendants.

those requirements had been met, the court held that the plaintiffs' proposed amendments related back to the filing date of the writ of summons.  Id.

In the instant matter, Plaintiff's addition of the First Amendment retaliation claim in the Amended Complaint clearly relates back to the Writ of Summons.  Federal Rule of Civil Procedure 15(c)(1)(B) provides that "[a]n amendment to a pleading relates back to the date of the original pleading when: . . . (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B).  Plaintiff's original Complaint raised claims of discrimination under both Title VII and the PHRA.  In support of her allegations, Plaintiff explicitly addressed the incident of Defendant Bellamy having Plaintiff "sick-checked."  (Compl. ¶ 23(f).)  Accordingly, the First Amendment retaliation claim in the Amended Complaint, which is based on the identical conduct identified in the original Complaint, clearly relates back to the origination of the lawsuit.  Under the foregoing jurisprudence and the Pennsylvania Rules, the proper origination date is the date of filing of the Writ of Summons, which was filed within two years of the incident in question.  As such, the Court declines to dismiss this portion of Plaintiff's retaliation claim against Defendant Bellamy as time-barred.

B.     Claim Preclusion

Defendants next argue that Plaintiff's claims against Sgt. Green, Lt. Covington, and Capt. Bellamy are barred by the doctrine of claim preclusion because Plaintiff could have raised them in the federal lawsuit she filed on July 13, 2012.  Upon thorough consideration, the court finds that the Defendants have not established all the elements of this doctrine.

The doctrine of claim preclusion bars a suit where three circumstances are present: "(1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3)

a subsequent suit based on the same cause of action." Lubrizol Corp. v. Exxon Corp., 929 F.2d 960, 963 (3d Cir. 1991); see also Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n.5 (1979). The principle of claim preclusion bars not only claims that were brought, but also those that could have been brought, in a previous action. In re Mullarkey, 536 F.3d 215, 225 (3d Cir. 2008); see also Marmon Coal Co. v. Director, Office of Workers' Compensation, No. Civ.A.12-3388, 726 F.3d 387, 394–95 (3d Cir. 2013). The three-part test is not to be applied mechanically; rather courts should "focus on the central purpose of the doctrine, to require a plaintiff to present all claims arising out [of] the same occurrence in a single suit." Sheridan v. NGK Metals Corp., 609 F.3d 239, 260 (3d Cir. 2010) (internal quotation and citations omitted).

In the instant matter, Defendants have failed to establish the second element of the claim preclusion test as to Defendants Green, Covington, and Bellamy. While Plaintiff filed a federal action in July 13, 2012, which led to a settlement and voluntary dismissal, that suit was brought against the City of Philadelphia, Lt. James Smith, P.O. Brant Miles, P.O. Andrew Schafer, P.O. Taven Washington, P.O. Kevin Devlin, P.O. Kenneth Long, and several John Doe police officers.[7] Defendants Green, Covington, and Bellamy were not named as Defendants in that lawsuit. Although some of her causes of action in this case against these Defendants may have arisen at the same time that she brought the previous lawsuit, the absence of identity among the Defendants bars the application of claim preclusion.[8]

---

[7] Notably, although Defendants the City of Philadelphia, Smith and Washington were named in both that lawsuit and this lawsuit, Plaintiff has conceded the dismissal of all claims against them in her current case.

[8] Defendants make the vague argument that the Defendants in this case are in privity with the parties in the prior suit because the City was named in the previous lawsuit and Defendants are City employees. In support they cite Jackson v. Dow Chem. Co., 902 F. Supp. 2d 658, 670–72 (E.D. Pa. 2012) for the proposition that because the City was sued in the prior action, a subsequent lawsuit brought against employees of the City is barred by the doctrine of claim

C.      Merits of First Amendment Retaliation Claim

In a final effort to obtain summary judgment on the entirety of the Complaint, Defendants contend that no genuine issue of material fact remains regarding the merits of the First Amendment retaliation claims, and that these claims must be dismissed.  In light of the record presented by the parties, the Court agrees.

In Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, 391 U.S. 563 (1968), the United States Supreme Court recognized that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general."  Id. at 568.  To balance the "interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees," a court must perform a multi-part test.  Id.  A government employee claiming a violation of his or her First Amendment rights must show "(1) that [he] engaged in protected activity; (2) that the government responded with retaliation; and (3) that the protected activity was the cause of the retaliation."  Estate of Smith v. Marasco, 318 F.3d 497,

_____

preclusion based the concept of privity.  In Jackson, however, the court held that—in a suit brought by an employee against his former employer—other employees of the former employer sued for their actions had a close and significant relationship with the employer and, thus, the RICO claims against the other employees were precluded by a prior final judgment on RICO claims against the employer.  Id. at 671.

In this case, however, Plaintiff has sued the individual Defendants not in their official capacities, but rather in their personal capacities for their alleged discriminatory and retaliatory actions.  "In the claim preclusion context, governmental officials sued in their official capacities for actions taken in the course of their duties are considered in privity with the governmental body. They may invoke a judgment in favor of the governmental entity as may that body itself." Gregory v. Chehi, 843 F.2d 111, 120 (3d Cir. 1988).  Where, as here, the officers are sued in their personal capacities, "[t]hat defense . . . does not avail the individuals."  Edmundson v. Borough of Kennett Square, 4 F.3d 186, 191 (3d Cir. 1993).  As such, the mere fact that the City was previously a party in a related suit by Plaintiff does not create privity with the individual officers not previously named.

512 (3d Cir. 2003) (citing Anderson v. Davila, 125 F.3d 148, 161 (3d Cir. 1997)). "A defendant may defeat the claim of retaliation by showing that it would have taken the same action even if the plaintiff had not engaged in the protected activity." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).

Under the first element, speech is protected if it implicates a matter of public concern. Hill v. Borough of Kutztown, 455 F.3d 225, 241 (3d Cir. 2006). "Speech implicates a matter of public concern if the content, form, and context establish that the speech involves a matter of political, social, or other concern to the community." Miller v. Clinton Cnty., 544 F.3d 542, 548 (3d Cir. 2008). "The content of the speech may involve a matter of public concern if it attempts 'to bring to light actual or potential wrongdoing or breach of public trust on the part of government officials.'" Baldassare v. State of N.J., 250 F.3d 188, 195 (3d Cir. 2001) (quotations omitted). Whether the activity in question is protected by the First Amendment is a question of law. Emigh v. Steffee, 442 F. App'x 660, 665 (3d Cir. 2011).

As to the second element, the Third Circuit has held that "[d]etermining whether a plaintiff's First Amendment rights were adversely affected by retaliatory conduct is a fact intensive inquiry focusing on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, *and the nature of the retaliatory acts.*" Brennan v. Norton, 350 F.3d 399, 419 (3d Cir. 2003) (quoting Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 686 (4th Cir. 2000) (emphasis in original)). Consequently, "[t]o properly balance these interests, courts have required that the nature of the retaliatory acts committed by a public employer be more than *de minimis* or trivial." Id. (quotations omitted). A public employer "adversely affects an employee's First Amendment rights when it refuses to rehire an employee because of the exercise of those rights or when it makes decisions, which relate to promotion,

transfer, recall and hiring, based on the exercise of an employee's First Amendment rights." Id. (quotation omitted).

Finally, to satisfy the third element, a plaintiff must prove that his protected activity was "a substantial or motivating factor" in the retaliatory action. See Hill, 455 F.3d at 243. A plaintiff is not required to prove "but-for" causation in order for the court to decide this element in his favor. See Suppan v. Dadonna, 203 F.3d 228, 236 (3d Cir. 2000). Rather, he need only prove that the decision was motivated in part by protected conduct before the burden shifts to the defendant to prove a lack of "but-for" causation. Id.; see also Scicchitano v. Cnty. of Northumberland, 112 F. Supp. 3d 293, 302 (M.D. Pa. 2015). "To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." Lauren W., 480 F.3d at 267. In the absence of proof of either unusually suggestive temporal proximity or a pattern of antagonism, the plaintiff must show that from the "evidence gleaned from the record as a whole" allows the trier of the fact to infer causation. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000). "A court must be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in his individual capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate." Lauren W., 480 F.3d at 267.

Plaintiff now asserts that the remaining individual Defendants—Bellamy, Brambrinck, Covington, McCoy, Green, Miller, and Henry-Jackson—retaliated against her for the exercise of her protected First Amendment rights. The allegations against these Defendants, as alleged by Plaintiff in her deposition, are as follows:

- **Defendant Bellamy:** Shortly after Plaintiff told Bellamy that three supervisors from UCD were harassing her in reference to her reporting corruption in November 2010, he instructed her to go home and use eight hours of vacation time, instead of sick time, in order to attend the Employee Assistance Program. (Roseberry Dep. 141:23–142:14, 144:20–147:4.) Shortly after that, Plaintiff was taken out of 5-squad and placed in line squad without any reason.[9] (Id. at 142:15–144:16.) In addition, at some point after Thanksgiving 2011, Bellamy denied Plaintiff a commendation for one of her arrests. (Id. at 313:3–315:3.) Capt. Bellamy also sick-checked Plaintiff in January 2012. (Id. at 258:3–9.)

- **Defendant Brambrinck:** Plaintiff asserts that Cpl. Brambrinck pushed her in the police lobby and said something to the effect of "watch where the f**k you're going next time." (Id. at 133:19–134:13.) Brambrinck also called her a "crazy b**ch" with respect to a problem with vacation schedules. (Id. at 172:11–174:17.) Finally, Brambrinck allegedly invented reasons to discipline Plaintiff for insubordination, such as accusing Plaintiff of trying to cash extra paychecks. (Id. at 135:11–137:15.)

- **Defendant Covington:** Plaintiff's allegations against Lt. Convington include the following: (1) on one occasion, Covington called her a "b***ch" after Plaintiff reported a problem with the patrol car to which she was assigned (id. at 150:9–151:11); and (2) Covington instructed her to not use police equipment, which Plaintiff had permission to use, and when Plaintiff complained to the Captain, Covington said, "this b***ch thinks she's slick." (Id. at 152:2–20, 191:18–193:18.)

---

[9] As noted above, claims regarding these actions are time-barred.

- **Defendant McCoy:** Plaintiff alleges that (1) on July 26, 2013, Plaintiff asked Sgt. McCoy for backup when Plaintiff witnessed two males fighting, but that backup took longer than usual to arrive, although it was less than thirty minutes (id. at 175:17–177:9); (2) one time, McCoy told another officer, Ronald Green, that McCoy was ordered to "f**k" with Plaintiff (id. at 181:23–182:20); (3) Plaintiff complained to McCoy about not receiving a working radio and McCoy did nothing about it (id. at 187:6–22); (4) on August 2, 2013, McCoy gave Plaintiff a counseling memo for abruptly exiting roll call before being dismissed (id. at 276:8–277:21); (5) on August 2, 2013, McCoy gave Plaintiff a counseling memo for allegedly contradicting McCoy's orders over dispatch regarding backup (id. at 278:19–280:11); and (5) on August 7, 2013, McCoy gave Plaintiff a memo requiring her to report to EAP on August 8, 2013. (Id. at 282:1–284:6.)

- **Defendant Green:** Plaintiff asserts that Sgt. Green humiliated her in front of other officers while instructing her to add information that she had no knowledge of to automobile accident reports. In doing so, he raised his voice to her and called her incompetent. (Id. at 183:6–16.)

- **Defendant Miller:** Plaintiff asserts that, on three to four occasions, Sgt. Miller unintentionally gave Plaintiff a radio that did not properly function and refused her requests for new radios. (Id. at 186:21–188:21.) On each occasion, she was able to get a replacement radio in about one hour. (Id. at 188:4–14.)

- **Defendant Henry-Jackson:** Plaintiff claims that, in the summer of 2012, Cpl. Henry-Jackson refused to take paperwork from Plaintiff, claiming that it was late even though it was not, and then throwing it in her face when Plaintiff tried to get someone else to help her with it. (Id. at 194:11–197:23.) At that same time, while Plaintiff was picking up her

papers, Defendant Henry-Jackson told Plaintiff that "[t]he City is coming after you." (Id. at 198:13–199:21.)

Faced with these allegations, Defendants, for purposes of this Motion, do not dispute that the speech at issue—Plaintiff's complaint about the 2010 break-in of her home by the police and her January 2012 Internal Affairs Complaint against Lt. Smith—is a matter of public concern and, thus, constitutes protected activity. Rather, Defendants now assert that Plaintiff cannot establish the second and third elements of a claim of First Amendment retaliation under Section 1983 against any of the remaining individual Defendants. The Court considers each of these elements individually.

1.    Adverse Employment Action

Turning initially to the second element of the retaliation test—adverse employment action—Plaintiff fails to establish that these incidents were "retaliation" such that Plaintiff's First Amendment rights were adversely affected. As noted above, "the key question in determining whether a cognizable First Amendment claim has been stated is whether 'the alleged retaliatory conduct was sufficient to deter a person of ordinary firmness from exercising his First Amendment rights.'" McKee v. Hart, 436 F.3d 165, 170 (3d Cir. 2006) (quoting Suppan, 203 F.3d at 235). The standard for an adverse employment action is not limited to conduct that affects the terms or conditions of employment, but is expanded to include any action that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." Davis v. City of Newark, 285 F. App'x 899, 904 (3d Cir. 2008) (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)). Nonetheless, "petty slights, minor annoyances, and simple lack of good manners will not create such deterrence;" rather, retaliation is actionable

only where it produces material injury or harm sufficient to deter opposition to or reporting of discriminatory employment practices. Burlington N., 548 U.S. at 68.

Repeatedly, courts have declined to find adverse action where the "alleged retaliatory acts were criticism, false accusations or verbal reprimands." Brennan v. Norton, 350 F.3d 399, 419 (3d Cir. 2003) (declining to find that the following allegations of retaliation, purportedly done after the plaintiff complained about practices in the fire department, were actionable in a First Amendment retaliation claim: transfer out of headquarters, threatening to make the plaintiff's life miserable, assigning plaintiff to ten-hour watch duties, telling others that the plaintiff was on medication that causes psychotic behavior, refusing to use the plaintiff's title or capitalize his name, requiring plaintiff to perform menial tasks, citing the plaintiff for "conduct unbecoming" charges, and subjecting the plaintiff to daily hostilities after he filed a complaint, including making derogatory remarks); see also Revell v. City of Jersey City, 394 F. App'x 903, 905 (3d Cir. 2010) (finding that none of the plaintiff's allegations of retaliation—purportedly done in response to a letter writing campaign by the plaintiff—rose to the level of retaliatory harassment; the plaintiff made allegations that the defendants threatened the plaintiff's brothers, told plaintiff to stop letters, required her to undergo a random drug test, required her to furnish a report explaining her one-day absence, called her a "bad catalyst" and "half a cop," and transferred her from the property room to patrol duty which did not affect cut in rank, pay or hours); Johnson v. Heimbach, No. Civ.A.03–2483, 2003 WL 22838476, at *6 (E.D. Pa. Nov. 25, 2003) (evaluations containing false perceptions, derogatory written comments, inadequately grounded conclusions of job effectiveness, and unkind words from colleagues would not deter a person of ordinary firmness from exercising First Amendment rights), aff'd, 112 F. App'x 866 (3d Cir. 2004); Bradshaw v. Twp. of Middletown, 296 F. Supp. 2d 526, 542 (D.N.J. Dec. 4,

2003) (public disagreement in the press with plaintiff not sufficient to deter a person of ordinary firmness from exercising his First Amendment rights), aff'd, 145 F. App'x 763 (3d Cir. 2005); Altieri v. Evanko, No. Civ.A.98–5495, 2003 WL 22005716, at *19–20 (E.D. Pa. Aug. 1, 2003) (unsuccessful attempt to entrap plaintiff into buying or selling drugs insufficient to chill speech); Kelleher v. City of Reading, No. Civ.A.01–3386, 2002 WL 1067442, at *5 n.6 (E.D. Pa. May 29, 2002) (monitoring and screening of private e-mails, dissemination of ethics complaint about the plaintiff to the media, initiation of rumors regarding the plaintiff's extramarital affair, and denial of parking permit unlikely to deter a person of ordinary firmness from exercise of protected activity).

With respect to all of Plaintiff's allegations, the Court does not find that any of them amount to punitive conduct that would deter a person of ordinary firmness from exercising her free speech rights.[10]  The alleged retaliatory acts are nothing more than criticism, false accusations, admonishments, and verbal reprimands, which do not rise to the level of a campaign of retaliatory harassment.  In most cases, Plaintiff indicated that she simply faced embarrassment from these actions, but suffered no tangible penalties.  (See Roseberry Dep. 137:16–18, 174:17–23 (receiving no penalizing action from her confrontation with Defendant Brambrinck other than facing a stressful environment); id. at 150:09–154:1 (confrontations with Defendant Brambrinck "just really ruined my reputation" and caused depression and anxiety; Plaintiff was only kept from using the police system for a day or two); id. at 175:17–177:9, 181:18–22 (Plaintiff only had a short wait for backup and never had the problem again); id. at 184:21–24 (incident with Sgt. Green "was embarrassing in front of [Plaintiff's] coworkers"); id. at 188:10–21 (failure to

---

[10] Notably, Defendant Bellamy's transfer of Plaintiff from 5-squad to line squad could potentially be considered an adverse employment action if it was deemed a demotion.  As discussed in detail above, however, any First Amendment retaliation claims based on that allegation are time-barred.

receive a working radio from Defendant Miller never lasted for more than one hour and Plaintiff did not view the action as intentional); id. at 197:21–23 (incident with Defendant Henry-Jackson "totally humiliated" her).)  Such allegedly retaliatory acts, which do not produce material injury or harm sufficient to deter opposition to or reporting of discriminatory employment practices, are simply not actionable.  Certainly, these isolated acts, even considered collectively, cannot be deemed to rise to the level of a campaign of harassment designed to have a chilling effect on Plaintiff's free speech rights.  Ultimately, it is undisputed that Plaintiff was not deterred from exercising her First Amendment rights as she filed a federal lawsuit in July 2012, and another internal complaint with the Police Department in October 2012.  Accordingly, Plaintiff's First Amendment retaliation claims against all Defendants are dismissed on this ground.

2.     Causation

Even assuming *arguendo* that such events could be deemed adverse employment actions, Plaintiff has failed to produce any evidence of a causal connection between her complaints and the foregoing actions.  In a cursory attempt to create a genuine issue of material fact on the issue of causation, Plaintiff alleges only that:

> Here, the timing shows that Plaintiff did not become a pariah within the police department until after she complained about the break-in of her home. Plaintiff had a successful career for about 15 years before the break-in.

> After Plaintiff complained about the break-in, she suddenly experienced a hostile work environment.  After the 2012 lawsuit, multiple adverse employment actions (described above) occurred.  It is not believable that an officer with a history of performing well suddenly suffered so many adverse employment actions.

> The direct and circumstantial evidence suggests a retaliatory motive.

(Pl.'s Resp. Opp'n Summ. J. 10.)

Plaintiff's argument, however, disregards the well-settled notion that "the mere fact that adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997). To be "unusually suggestive" of a retaliatory motive, "the temporal proximity must be immediate." Lorah v. Tetra Tech, Inc., 541 F. Supp. 2d 629, 636 (D. Del. 2009). The Third Circuit has indicated that a temporal proximity of two days is sufficient to establish causation, see Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 & n.5 (3d Cir. 2000), whereas a temporal proximity of ten days is sufficient to establish causation only when accompanied by other evidence of wrongdoing. Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 189 (3d Cir. 2003); see also Fischer v. Transue, No. Civ.A.04–2756, 2008 WL 3981521, at *10 (M.D. Pa. Aug. 22, 2008) (holding that temporal proximity of twenty-two days was insufficient to establish causation); Smith v. ABF Freight Sys., Inc., No. Civ.A.04–2231, 2007 WL 3231969, at *11 (M.D. Pa. Oct. 29, 2007) (holding that temporal proximity of one and one-half months was insufficient to establish causation); Mar v. City of McKeesport, No. Civ.A.05–19, 2007 WL 2769718, at *4 (W.D. Pa. Sept. 20, 2007) (holding that temporal proximity of three months was insufficient to establish causation); Killen v. N.W. Human Servs., Inc., No. Civ.A.06–4100, 2007 WL 2684541, at *8 (E.D. Pa. Sept. 7, 2007) (holding that temporal proximity of seventeen days was insufficient to establish causation). "This suggests that the temporal proximity must be measured in days, rather than in weeks or months, to suggest causation without corroborative evidence." Conklin v. Warrington Twp., No. Civ.A.06–2245, 2009 WL 1227950, at *3 (M.D. Pa. April 30, 2009). "[I]n cases where temporal proximity is not 'unusually suggestive' of retaliatory motive, the Third Circuit has demanded further evidence to substantiate a causal connection." McCloud v. United Parcel Serv., Inc., 543 F. Supp. 2d 391,

401–02 (E.D. Pa. 2008). "Such other evidence may include, but is not limited to, a 'pattern of antagonism' by the employer that could link the adverse action with Plaintiff's complaint." Id. "Merely engaging in a protected activity prior to suffering an adverse employment action does not give rise to a harm cognizable as retaliation under Title VII or the ADEA." Barthold v. Briarleaf Nursing & Convalescent Ctr. Nursing Home, No. Civ.A.13-2463, 2014 WL 2921534, at *6 (E.D. Pa. June 27, 2014).

In the present case, Plaintiff cannot even recall when many of the alleged incidents took place. Moreover, as to those events for which Plaintiff can recall a date, none of them have any unusually suggestive temporal proximity to Plaintiff's protected First Amendment speech in the form of her October 2010 complaint about the break-in at her home or her January, 2012 Internal Affairs complaint about Lt. Smith. (See Roseberry Dep. 313:3–315:3 (Bellamy denied Plaintiff a commendation sometime after Thanksgiving 2011); id. at 134:3–137:18 (incidents with Brambrinck occurred sometime after Thanksgiving 2011 and before April 2012, prior to filing of suit); id. at 151:8–152:21 (incidents with Lt. Covington occurred sometime after Thanksgiving 2011, with no clear date); id. at 175:17–177:9; 276:8–277:21; 278:19–280:11; 282:1–284:6); id. at 183:6–184:5 (Plaintiff cannot recall date of incident with Green); id. at 186:21–188:21 (no date given for Plaintiff's incidents with Sgt. Miller); id. at 197:11–197:16 (incidents with Cpl. Henry-Jackson occurred some time in the summer of 2012, with no clear date given).) Although it is undisputed that a number of the Defendant officers were aware of Plaintiff's complaints, Plaintiff effectively concedes that she has no other evidence to establish that an intent to retaliate against her contributed to the various discrete acts that form the basis of her claim. At this juncture in the litigation, and in the face of a well-supported summary judgment motion, merely pleading a tenuous causal connection on the basis of personal belief does not satisfy the non-

moving party's burden. Absent at least a modicum of evidence on which a finder of fact could make an inference of causation, the Court cannot find that a genuine issue of material fact sufficient to survive summary judgment exists.[11]  Therefore, Plaintiff's First Amendment retaliation claims are dismissed on this ground as well.

## IV.     CONCLUSION

In light of the foregoing, the Court must grant summary judgment in favor of Defendants on the entirety of Plaintiff's Complaint.  First, as per Plaintiff's own concession, the Court dismisses all claims against Defendant City of Philadelphia, all claims against Defendants Washington, Cook, McBride, and Smith, and her claim of a conspiracy under 42 U.S.C. § 1985. Second, to the extent any claim is based on actions by Defendants prior to December 20, 2011, that portion of the claim is dismissed.  Finally, judgment is entered in favor of the remaining Defendants on all First Amendment retaliation claims against them in light of Plaintiff's failure to create any genuine issue of material fact on the questions of adverse employment action and causation.

An appropriate Order follows.

BY THE COURT:

/s/John R. Padova
_____

John R. Padova, J.

---

[11] Having held that Plaintiff has not satisfied her burden of proving either adverse action or that there is a causal link between her protected First Amendment activity and the actions that she alleges are adverse, the Court need not address Defendants' claims of qualified immunity.